UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CAMILLE MUKES, | : | Case No. 3:12-cv-00137 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS REVERSED; AND
(2) JUDGMENT SHALL BE ENTERED IN FAVOR OF PLAINTIFF
AWARDING BENEFITS**

This is a Social Security disability benefits appeal. At issue is whether the
administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and
therefore unentitled to disability insurance benefits ("DIB"). (*See* Administrative
Transcript ("Page ID") (Page ID 43-61) (ALJ's decision)).

**I.**

In February 2009, Plaintiff applied for DIB alleging disability as of January 5,
2004. (Page ID 51, 103-4, 181-84). Plaintiff alleged disability due to right-sided
numbness and weakness, reportedly due to a cerebrovascular accident [1] sometime in her
childhood. (Page ID 53). The state agency denied Plaintiff's application initially and

---

[1] Cerebrovascular is defined as involving the cerebrum (an enlarged anterior or upper part of the
brain). Available at: http://www.merriam-webster.com/dictionary/.

upon reconsideration, and Plaintiff timely requested a hearing.  (Page ID 106-9, 113-15, 120-21).  In May 2011, the ALJ held a hearing at which Plaintiff amended her alleged onset date of disability to December 19, 2008.  (Page ID 72-101).  In September 2011, the ALJ found that Plaintiff was not entitled to DIB during the relevant time (*i.e.*, from December 19, 2008 through September 2, 2011).  (Page ID 51-61).  In March 2012, the Appeals Council upheld the ALJ's decision and rendered it the Commissioner's final and appealable decision.  20 C.F.R. §§ 404.955 and 404.981.  *See also* (Page ID 43-46).

Plaintiff was 28 years old on the alleged disability date and is considered to be a "younger person" for Social Security purposes.  20 C.F.R. §§ 404.1563(c) and 416.963(c).  (Page ID 60)  She is a high school graduate.  (Page ID 77).  Plaintiff's prior relevant employment included working as a teller at a credit union and working as an assistant manager for an apartment complex.  (Page ID 77-78, 89).  She stopped working as a teller on December 20, 2008, and the ALJ found that she could not return to her past work.  (Page ID 60, 79).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1. The Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2012.  (Page ID 53).

2. The Plaintiff has not engaged in substantial gainful activity since December 20, 2008, the amended alleged disability onset date.  20 C.F.R. § 404.1571 *et seq*. (Page ID 53).

3. The Plaintiff has the following severe impairments: residuals of possible remote cerebrovascular accident; right-sided hemiplegia with cavovarus foot; and obesity. 20 C.F.R. § 404.1520(c).  (Page ID 53-55).

4. The Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  (Page ID 55-56).

5. The Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she can frequently perform fingering and handling with the right (non-dominant) hand.  (Page ID 56-60).

6. The Plaintiff is unable to perform any past relevant work.  20 C.F.R. § 404.1565. (Page ID 60).

7. The Plaintiff was born on March 31, 1975 and was 28 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  20 C.F.R. § 404.1563.  (Page ID 60).

8. The Plaintiff has at least a high school education and is able to communicate in English.  20 C.F.R. § 404.1564.  (Page ID 60).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the Plaintiff has transferable job skills.  20 C.F.R. § 404(P)(2).  (Page ID 60).

10. Considering the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  20 C.F.R. §§ 404.1569 and 404.1569(a). (Page ID 60-61).

11. The Plaintiff has not been under a disability, as defined in the Social Security Act, from January 5, 2004, through the date of this decision.  (Page ID 61).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations ("SSR") and was therefore not entitled to DIB. (Page ID 55).

On appeal, Plaintiff argues that: (1) the ALJ's finding that Plaintiff suffers from no severe mental impairments is erroneous and unsupported; (2) the assigned residual functional capacity lacks substantial evidentiary support; (3) the ALJ erred in substituting her own opinions for the assessments of medical professionals; (4) the ALJ failed to properly weigh the opinions of the state agency consulting physical and psychological consultants; (5) the ALJ failed to adequately articulate reasons for finding that Plaintiff's impairments do not meet listing 11.04; (6) the Appeals Council erred in failing to review the ALJ's decision or articulate reasons for declining review; and (7) the ALJ's decision is not supported by substantial evidence and the Commissioner's position is not substantially justified. (Page ID 697).

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that

finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion. The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts. If the Commissioner's decision is supported
> by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

Plaintiff bears the ultimate burden to prove by sufficient evidence that she is

entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present

sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that

left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

The Secretary's regulations provide a step-by-step review process for determining

disability. 20 C.F.R. § 404.1520. If at any step in the review the Secretary makes a

decision that the Plaintiff is or is not disabled, review of the claim ceases. 20 C.F.R.

§ 404.1520(a). *See also Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985). The

sequential consideration of a disability claim proceeds as follows:

(1) Is the claimant working? If not,

(2) Does the claimant have a severe impairment? If he does,

(3) Does the claimant have an impairment listed in appendix one to 20 C.F.R., part
404, subpart p (i.e., a "listed impairment")? If not,

(4) Does the claimant's impairment prevent him from doing his past relevant work?  (*i.e.,* "the grid" is applied), and

(5) Does the claimant's impairment prevent him from doing any other work?  (*i.e.,* "the grid" is applied).

*Mowery,* 771 F.2d at 970.

## A.

Here, the record reflects that:

Plaintiff testified to having problems with weakness, numbness, and pain along the right side of her body due to the residuals of a stroke when she was an infant.  (Page ID 80).  Although these problems were lifelong, Plaintiff claims they worsened significantly around the time she had to stop working.  (*Id.*)

Physical Impairments

Barry Fisher, M.D., has been Plaintiff's primary care physician at all relevant times.  Plaintiff has a long history of headaches and right hemiparesis reported and observed by Dr. Fisher.[2]  Plaintiff's treatment notes from Dr. Fisher reflect ongoing complaints of headaches, predominantly on the right side.  (Page ID 439, 456, 458, 485, 578, 607).  These notes also reflect complaints of numbness and the presence of swelling in Plaintiff's left foot and ankle.  (Page ID 598-600).  A brain MRI,

---

[2] Hemiparesis is defined as a chronic weakness affecting one side of the body generally caused by either a stroke or a neurological condition such as cerebral palsy.  Available at: http://www.merriam-webster.com/medical.

performed on May 1, 2004, revealed findings consistent with a remote infarct in her brain.[3]  (Page ID 397).

In March 2009, Dr. Fisher referred Plaintiff to a consult for the selection and fitting of a new right leg brace due to her increasing lower extremity problems.  (Page ID 605).  The notes of the consult reflect that Plaintiff was unable to dorsiflex her right ankle,[4] consistent with a foot drop,[5] secondary to her neurological abnormality. (*Id*.)  Ultimately, Plaintiff was fitted for and began wearing a solid, full-length right ankle-foot orthotic brace designed for partial weight-bearing.  (*Id*.)

On July 20, 2009, Plaintiff underwent a physical therapy assessment at the request of Dr. Fisher.  (Page ID 582).  The physical therapist recorded that Plaintiff's gait was prolonged, and significant for a minimal Trendelenberg pattern on the right,[6] and right ankle movements were limited to 0 degrees.  (*Id*.)  Problems identified during the assessment included difficulty walking, decreased balance, decreased coordination, decreased mobility, and decreased right extremity strength.  (Page ID 583).

---

[3] Infarct is defined as an area of necrosis in a tissue or organ resulting from obstruction of the local circulation by a thrombus or embolus.  Available at: http://www.merriam-webster.com/medical/infarct.

[4] Dorsiflexion involves pivoting the toes and ball of the foot upward at the ankle joint.  Available at: http://www.merriam-webster.com/medical/dorsiflex.

[5] Foot drop is defined as an extended position of the foot caused by paralysis of the flexor muscles of the leg.  Available at: http://www.merriam-webster.com/medical/footdrop.

[6] A Trendelenburg gait is defined as an abnormal, leaning gait occasioned by weakness in one lower extremity.  (Page ID 693).

Plaintiff's physical therapy plan involved a four-week home exercise program and outpatient monitoring. (Page ID 583, 586-89). Monitoring notes reflect ongoing problems with gait stability. (Page ID 588-89) By September 20, 2009, there had been some increase in Plaintiff's coordination and right lower extremity strength, but her therapy goals remained unmet. (Page ID 586).

On January 5, 2011, Plaintiff consulted with podiatric surgeon Eric Polansky, M.D., regarding her foot problems. (Page ID 608-10). Dr. Polansky noted Plaintiff's right clubfoot,[7] drop foot,[8] and *gastroc-soleus equinus,*[9] as well as flattening of her left foot. (Page ID 610). Dr. Polansky suggested alternative orthotics and the possibility of Achilles lengthening surgery. (*Id.*) Following a pre-operative consult in May 2011, an Achilles lengthening surgery was scheduled for June 3, 2011 (three days after her hearing with the ALJ). (Page ID 611-16).

In an April 3, 2009 note to Social Security, Dr. Fisher found that Plaintiff had deformities in her right extremities due to remote neurological problems. (Page ID 435). Dr. Fisher recorded Plaintiff's complaints of significant right side difficulties, but asked for evaluations by specialists to assess her ability to work. (*Id.*)

---

[7] Clubfoot is defined as any of numerous congenital deformities of the foot in which it is twisted out of position or shape. Available at: http://www.merriam-webster.com/medical/club%20foot.

[8] Foot drop is defined as an extended position of the foot caused by paralysis of the flexor muscles of the leg. *Available at:* http://www.merriam-webster.com/medical/footdrop.

[9] *Gastroc-soleus equinus* references a shortening of Plaintiff's Achilles tendon. (Page ID 694).

On May 4, 2009, state agency consulting physician Avairs Vitols, M.D,
performed a physical examination of Plaintiff. (Page ID 554-61). Dr. Vitols noted
Plaintiff's gait was slightly antalgic and had been altered to compensate for her right
foot drop.[10] (Page ID 556). Upon testing, Dr. Vitols documented weakness in
Plaintiff's right arm musculature and significant weakness of right wrist, grip, and
pinch. (*Id.*) Plaintiff's right calf had atrophied, and Dr. Vitols found "no active ability
to dorsiflex or move the ankle or great toes [sic]" on Plaintiff's right side. (*Id.*)
Ultimately, Dr. Vitols opined as follows:

> The Plaintiff's ability to stand and walk and carry on work
> related activities are affected by right-sided weakness. She
> requires a foot drop brace. She does not have the capabilities
> of walking and standing for prolonged periods of time. Her
> ability to use her right upper extremity is limited to sedentary,
> self-assistive type of activities. There is no impaired ability
> in use of the left upper extremity.

(Page ID 556).

Following Dr. Vitols' examination, state agency consultant Ronald Cantor, M.D.,
reviewed the record and drafted an opinion regarding Plaintiff's physical functional
limitations. (Page ID 563-70). Dr. Cantor concluded that Plaintiff was capable of
performing light work, could not use right foot controls, could only occasionally balance,
should not be exposed to hazards, and could only occasionally perform handling and

---

[10] Antalgic gait is defined as a limp adopted so as to avoid pain on weight-bearing structures,
characterized by a very short stance phase. Available at: http://thefreedictionary.com

fingering with her right hand. (Page ID 564-67). Dr. Cantor set aside Dr. Vitols'
opinions regarding Plaintiff's limited ability to stand or walk asserting that those
statements were "reserved for the commissioner" and stated that during Dr. Vitols'
examination Plaintiff "was noted to be able to ambulate and move about." (Page ID
569). On September 13, 2009, state agency reviewer, Jerry McCloud, M.D., affirmed
Dr. Cantor's assessment. (Page ID 585).

## B.

Plaintiff argues that the ALJ erred at step three of the sequential disability analysis
by concluding there was not sufficient evidence in the record to show that Plaintiff's
physical impairments met 11.04(B) of the Listing of Impairments.[11]

Listing 11.04(B) states:

**11.04 Central nervous system vascular accident.**[12] With one of the following
more than three months post-vascular accident:

A. Sensory or motor aphasia resulting in ineffective speech or communication; or

_____

[11] At step three, a claimant will be found disabled if her impairment meets or equals any of the
listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).
*Turner v. Comm'r of Soc. Sec.,* 381 Fed.3d 488, 491 (6th Cir. 2010).

[12] There is un-contradicted medical evidence in the record that Plaintiff suffered a
cerebrovascular accident. A May 1, 2004, MRI showed a remote lacunar infarct. On April 3,
2009, Dr. Fisher noted that Plaintiff has deformities in her right extremities due to remote
neurological problems. (Page ID 435). On May 4, 2009, Dr. Vitols noted that Plaintiff suffered
"a childhood stroke with residual right upper and right lower extremity weakness." (Page ID
556).

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (*see* 11.00(C)). [13]

The ALJ evaluated Plaintiff's condition under section 11.00 of the Listing of Impairments and determined in pertinent part that "…the record does not show the requisite sustained disturbance of gross and dexterous movements or of gait and station, …disorganization of motor function, …or fatigue of muscle function as set forth in any listing of this section." (Page ID 55).

The Court finds that the ALJ's determination at step three of her analysis is not supported by substantial evidence because Plaintiff met the requirements of 11.04(B).

First, there is not substantial evidence to support the ALJ's conclusion that Plaintiff failed to show significant and persistent disorganization of motor function in her right leg and foot. The consistent records of multiple medical providers over an extended period of time documented Plaintiff's complete inability to dorsiflex her right ankle and diagnosed Plaintiff with foot drop. On March 9, 2009, Plaintiff presented to Kevin Schraeder, D.P.M. for an evaluation of her right-sided complaints. Dr. Schraeder found Plaintiff had decreased sensation and atrophy of the right lower extremity, especially in

---

[13] The Sixth Circuit has defined *significant* as "having or likely to have influence or effect: deserving to be considered." *Mowery,* 771 F.2d at 972. Listing 11.00(C) defines *Persistent disorganization of motor function* "in the form of paresis of paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with the locomotion and/or interference with use of fingers, hands, and arms."

the *gastroconemis* and further found Plaintiff had an inability to dorsiflex her right ankle consistent with a foot drop.  (Page ID 605).  On April 3, 2009, Plaintiff's family physician of five years, Dr. Fisher, noted that Plaintiff has deformities in her right extremities due to remote neurological problems.  (Page ID 435).  On May 4, 2009, a physical examination of Plaintiff by Dr.  Vitols  showed  Plaintiff had no active ability to dorsiflex or move her right ankle or great toes.  (Page ID 556).  Dr. Vitols further noted that Plaintiff's right calf had atrophied and the circumference of Plaintiff's left calve was 45 inches, while the circumference of the right calve was only 33 inches.  (Page ID 559).  On May 14, 2009, Dr. Cantor completed a physical capacities assessment and found that Plaintiff "could never operate foot controls on the right" and noted atrophy in the right calf.  (Page ID 565).  On July 20, 2009, physical therapist Ms. Clagg found Plaintiff had decreased right extremity strength and that her right ankle movements were limited to 0 degrees.  (Page ID 583).  On September 13, 2009, Dr. McCloud affirmed Dr. Cantor's assessment.  (Page ID 585).  On January 5, 2011, Plaintiff consulted with podiatric surgeon Dr. Polansky, who noted Plaintiff's right clubfoot, drop foot, *gastro-soleus equines,* and the flattening of her left foot.  (Page ID 610).  On March 16, 2011, Richard Laughlin, M.D., diagnosed Plaintiff with right-sided hemiplegia with cavovarus foot. (Page ID 611).  In a note to Dr. Fisher on March 16, 2011, Dr. Laughlin examined Plaintiff's lower extremities and noted that she has a small limb inequality with the right foot being shorter than the left.  On standing, Dr. Laughlin found that Plaintiff stands on

the lateral border of her foot. Finally, Dr. Laughlin observed that Plaintiff has varus[14] heel and mild cavus[15] of the foot. (Page ID 615). These repeated and consistent findings vitiate the ALJ's conclusion that Plaintiff failed to show significant and persistent disorganization of motor function in her right leg and foot.

Second, there is not substantial evidence to support the ALJ's conclusion that Plaintiff failed to show significant and persistent disorganization of motor function of her right arm and hand. Again, the consistent records of multiple medical providers documented Plaintiff's significant impairment. On May 4, 2009, Dr. Vitols examined Plaintiff and reported that "the right arm reveals a 4/5 weakness in the upper and forearm musculature," and she "showed significant weakness of the wrist and in grip and pinch strength." (Page ID 556). On May 14, 2009, Dr. Cantor completed a physical capacities assessment and found, consistent with Dr. Vitols' conclusions, that Plaintiff's "grasp and manipulation were reduced on the right side." (Page ID 565).

Third, there is not substantial evidence to support the ALJ's conclusion that Plaintiff failed to show that her impairments resulted in sustained distribution of gross and dexterous movements, or gait and station. As to Plaintiff's gait and station impairment, the following medical evidence appears in the record:

---

[14] Varus is defined as of, relating to, or being a deformity in which an anatomical part is turned inward toward the midline of the body to an abnormal degree. Available at: http://www.merriam-webster.com/medical/varus.

[15] Cavus is defined as a foot deformity characterized by an abnormally high arch. Available at: http://www.merriam-webster.com/medical/pes+cavus.

- On April 16, 2009, Dr. Jones conducted a clinical interview with Plaintiff and observed that Plaintiff's body movements were "slow and awkward" and that Plaintiff walked with a limp. (Page ID 528-34).

- On May 4, 2009, Dr. Vitols performed a physical examination of Plaintiff and found Plaintiff's gait was high stepped, slightly antalgic, and had been altered to compensate for her right foot drop. (Page ID 556).

- On May 14, 2009, Dr. Cantor completed a physical capacities assessment confirming Dr. Vitols' finding and noting "antalgic gait favoring the right leg." (Page ID 564).

- On July 20, 2009, physical therapist Ms. Clagg performed several tests to analyze Plaintiff's station and gait. As to station, Ms. Clagg found Plaintiff failed the Romberg Test because she was only able to stand in position on the floor with her eyes closed for 2.62 sec. and on foam with her eyes open for 2.84 sec.[16] Ms. Clagg further administered a single-leg-stance test and found Plaintiff scored significantly below normal - she was able to stand on her right leg for a mere 1.25 sec.[17] Lastly, Ms. Clagg administered a dynamic gait index test and found Plaintiff scored only 17 out of 24, thus indicating that Plaintiff had an

---

[16] The Romberg Test is utilized to assess for postural instability. To execute the test an administrator asks the patient to stand with their eyes open, arms across their chest and ankles together. They are instructed to hold this position for 30 sec., while postural sway is assessed. Next, the administrator asks the patient to close their eyes and assess for postural sway. A patient fails the test if they are unable to keep their eyes closed, lose balance requiring the feet to move, fall, or are unable to maintain their arms across the chest during the 30 sec. test. Available at: www.physicaltherapynation.com/blog/2012/04/balance-outcome-measures-2/.

[17] The Single Leg Stance Test measures postural stability (i.e., balance). To perform the test, the patient is instructed to stand on one leg without support of the upper extremities or bracing of the un-weighted leg against the stance leg. The patient's eyes are open with gaze fixed straight ahead. The number of seconds that the patient is able to maintain this position is recorded. Normal ranges with eyes open are: 22.5 sec. (± 8.6 sec.) for ages 60-69 years and 14.2 sec. (± 9.3 sec.) for ages 70-79 years. It has been reported in the literature that individuals increase their chances of sustaining an injury due to a fall by two times if they are unable to perform a Single Leg Stance Test for five sec. Available at: http://physical-therapy.advanceweb.com/Article/One-Legged-Single-Limb-Stance-Test.aspx.

increased risk of falling.[18] Ms. Clagg found "Plaintiff's gait is significant for minimal trandelenberg pattern on right with prolonged gait."[19] Ms. Clagg further noted findings consistent with right-sided weakness and a gait abnormality with problems in: (1) difficulty in walking; (2) decreased balance and coordination; (3) decreased mobility; and (4) decreased right extremity strength. (Page ID 583). Ms. Clagg further described Plaintiff's posture, noting Plaintiff "stands with forward head posture, rounded shoulders, forward flexed at the waist and wide base of support. (Page ID 583).

As to Plaintiff's sustained distribution of gross and dexterous movements in her right arm

and hand, the following medical evidence appears in the record:

- On May 4, 2009, Dr. Vitols examined Plaintiff and reported that "the right arm reveals a 4/5 weakness in the upper and forearm musculature" and Plaintiff "showed significant weakness of the wrist and in grip and pinch strength." As to specific abnormalities observed during the Manual Muscle Testing, Dr. Vitols examined Plaintiff for the ability to grip, manipulate, pinch and show fine coordination in her right hand. (Page ID 556). For each category, his finding was "abnormal." (Page ID 558). Moreover, in response to a form question asking about Plaintiff's ability to pick up large and small objects, Dr. Vitols noted that Plaintiff had significant weakness with her right hand. (Page ID 559).

- On May 14, 2009, Dr. Cantor completed a physical capacities assessment and found, consistent with Dr. Vitols' conclusions, that Plaintiff's "grasp and manipulation were reduced on the right side." (Page ID 565).

---

[18] The dynamic gait index (DGI) is designed to measure a patient's functional balance and postural stability for the purpose of predicting fall risk. It is designed to examine a patient's ability to adapt their gait when task demands change. This test consists of eight different tasks that the patients are rated on using a 0 to 3 ordinal scale (0 = severe impairment, 1 = moderate, 2 = mild, 3 = normal). The tasks include the following: ambulating on a level surface, ambulating while changing speeds, ambulating with horizontal head turns, ambulating with vertical head turns, ambulating with pivot turns, stepping over obstacles, stepping around obstacles, and ascending/descending stairs. A score of 19 or less is indicative of increased fall risk. Available at: http://pt.unlv.edu/ebpt/tests/Ambulation/Dynamic%20Gait%20Index.pdf.

[19] Plaintiff's gait speed is .91 m/sec. (Normal gait speed for someone Plaintiff's age is 1.41 m/sec.). (Page ID 583).

The ALJ gave "little weight" to the consistent and overwhelming medical evidence summarized above for the following four main reasons: (1) Plaintiff did not use any ambulatory aids and was able to ambulate without a brace; (2) Plaintiff reported increased right leg strength and improved balance over time; (3) Plaintiff's failure to mention fingering or handling difficulties as reasons for leaving her job as a bank teller; and (4) Plaintiff's description of daily activities were inconsistent with medical findings and Listing 11.04(B) listing.  (Page ID 57-59).  These points will be addressed below, *seriatim.*

The ALJ found it significant that Plaintiff could ambulate without a leg brace and did not use any ambulatory aids.  (Page ID 57, 724).  The ability to ambulate without aids, however, in no way detracts from the consistent medical evidence that Plaintiff suffered a significant and persistent disorganization of motor function of her right foot that resulted in sustained distribution of gross movements and gait.  Section 11.04(B) does not require that a claimant prove she is unable to ambulate without a brace or other aid.  Indeed, 11.04(B) does not mention ambulatory aids.

The ALJ underscores the fact that Plaintiff reported to her physical therapist, Ms. Clagg, that she felt "increased" right leg strength and "improved" balance over the course of her physical therapy.  (Page ID 589).  The ALJ ignores, however, that Ms. Clagg never changed her finding that Plaintiff's gait was prolonged and significant for a minimal trendelenberg pattern on the right side and Plaintiff's right ankle movements were limited

16

to 0 degrees.  (Page ID 586-87).  Plaintiff's physical therapy plan involved a four-week home exercise program and outpatient monitoring.  By September 20, 2009, monitoring notes reflect that there had been some increase in Plaintiff's coordination and right lower extremity strength, but Plaintiff continued to have ongoing problems with gait stability and ultimately her therapy goals remained unmet.  (Page ID 589).  The ALJ inappropriately discredited this important medical evidence.

Further, the ALJ concluded that Plaintiff's failure to mention fingering or handling difficulties as a reason for why she left her job as a bank teller precludes her from now claiming that she suffers from a hand impairment.  However, the ALJ offers no precedent for the suggestion that overwhelming medical testimony about an impairment will not be credited if a claimant fails to list it as a reason for leaving her last employment.  Moreover, the ALJ ignores that Plaintiff clearly explained to the Social Security Administration in regards to her past work that "both the jobs had a lot of things I could not do…When *working at the bank using my hands* and standing or sitting *got to be hard for me*."  (Page ID 653) (emphasis added).

Finally, the ALJ attempts to undervalue the weight of overwhelming medical evidence supporting Plaintiff's 11.04(B) disability listing by concluding that it is "obvious" that Plaintiff's daily activities are inconsistent with her claimed impairments and medical findings.  With respect to Plaintiff's foot impairments, the ALJ finds several activities – grocery shopping, bike riding, and driving – to be incompatible

with Plaintiff's disability.  For example, Plaintiff stated that she kept "quite busy" during the day and could ambulate "throughout [an] entire grocery store or large department store."  (Page ID 58, 611).  However, Plaintiff only shops about four times a month, and when she does, it only takes her about thirty minutes.  Such activity does not contradict the medical evidence that Plaintiff has a disorganization of motor function of her right foot that resulted in sustained distribution of gross movements and gait.  Similarly, the ALJ's emphasis on the fact that Plaintiff could ride a bicycle for 20-30 minutes and occasionally drive a car short distances does not contradict medical evidence supporting her 11.04(B) listing.  (Page ID 58).  To hold otherwise would ignore the fact that even a one-legged person can ride a bicycle and drive a car. Here, Plaintiff has use of both legs, but within the confines of 11.04(B).  That is not (as the ALJ asserts) "obviously" inconsistent with exercise on a bicycle or driving a car. Similarly, there is no inconsistency between Plaintiff's 11.04(B) listing and her daily activities with respect to the use of her right hand (e.g., light yard work, laundry, cooking and washing dishes).  The record reveals, for example, that Plaintiff reported making meals like sandwiches depending "on how numb my hand, foot, and leg [are]." (Page ID 659-661).  Plaintiff reported to the Social Security Administration that she dresses, bathes, brushes her hair, and feeds herself with her left hand because her right is weak and has had to change her habits, such as cooking, because she can no longer "stir or hold things."  (Page ID 659).  Perhaps most pointedly, while Plaintiff

reported that she can do "some light cleaning and very light yard work," she very clearly provides context to those activities by stating, "If it requires me to use both hands, can't do it." (Page ID 660). In short, none of Plaintiff's daily activities *require* the use of both hands. The ALJ's protestations to the contrary are not supported by substantial evidence.

The standard of review of an ALJ's decision is deferential, and the Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). "'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir. 1981) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). However, a substantiality of evidence evaluation does not permit a selective reading of the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal quotes and citations omitted).

In the case at bar, the ALJ erred in selectively reading the record and making conclusions that constituted a "cherry picking" of evidence, designed to produce the result of a negative finding. The ALJ did not consider "all relevant evidence" as is

required, but erroneously relied instead only on that information supporting her final conclusion. *See Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir. 2000) (quoting *Clifford v. Apfel,* 227 F.3d 863, 871 (7th Cir. 2000)). In other words, there is no "logical bridge" between the evidence in the record and the ALJ's conclusion. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). The ALJ's decision to give "little weight" to medical findings of a treating physician and various other medical providers stems from a narrow view of the record. For these reasons, this Court does not find substantial evidence supporting the ALJ's conclusion that Plaintiff failed to meet the 11.04(B) listing.

## C.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g). *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the

presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. Such is the case here.[20]

In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *See e.g., Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1053-54 (6th Cir. 1983). In the instant action, consideration of Plaintiff's combined impairments brings her within the criteria for section 11.04(B) of the Listing of Impairments. As fully recited herein, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of treating and consulting medical providers, proof of disability is overwhelming, and remand will serve no purpose other than delay.[21]

---

[20] At step three of the sequential analysis, this Court finds that there is overwhelming evidence that Plaintiff has the impairments listed in appendix one to 20 C.F.R. § 404(p) Listing 11.04(B). Therefore, this Court is not obliged to continue the analysis to steps four and five and concludes at step three that Plaintiff is disabled. *Mowery,* 771 F.2d at 970.

[21] Because the Court is reversing the decision of the ALJ for the reasons stated above, it is unnecessary to address Plaintiff's additional assignments of error.

**III.**

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that

Camille Mukes was not entitled to disability insurance benefits beginning September 2,

2011, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**,

and it is **REVERSED**; and this matter is **REMANDED** to the Commissioner for an

immediate award of benefits.

Date:  May 20, 2013                                        ___*s/ Timothy S. Black*_____
                                                                 Timothy S. Black
                                                                 United States District Judge